AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
JAN 2 4 2020

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One Red Huawei Cellular Phone
IMEI 861677042678956

Case No.  20MJ0319

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960, 963 | Importation of a Controlled Substance; conspiracy to import |

The application is based on these facts:

See attached Affidavit of Special Agent Keith Banks

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Keith Banks, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: January 24, 2020

_____
*Judge's signature*

City and state: San Diego, CA

Hon. Andrew G. Schopler
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Keith A. Banks, having been duly sworn, do hereby state that the following is true to my knowledge and belief:

## INTRODUCTION

1. I make this affidavit in support of an application for warrants to search the following electronic devices, as further described in Attachments A-1 and A-2 (the "**Target Devices**"), and seize evidence of violations of federal law, namely 21 U.S.C. §§ 952, 960, and 963, as further described in Attachment B:

> Red Huawei Cellular Phone
> IMEI 861677042678956
> ("**Target Device 1**" as described in Attachment A-1)
>
> Green Apple iPhone
> Model No. A1532
> IMEI: 013982001230105
> ("**Target Device 2**" as described in Attachment A-2)

This search warrant supports an investigation and prosecution of Luis Enrique VELARDE-Camacho ("VELARDE"), who is currently charged with committing violations of 21 U.S.C. §§ 952 and 960. A factual explanation supporting probable cause follows.

2. Officers with the Department of Homeland Security, United States Customs and Border Protection ("CBP"), seized the **Target Devices** from VELARDE on January 15, 2020, when he was arrested at the Otay Mesa Commercial Facility for drug smuggling, in violation of 21 U.S.C. §§ 952 and 960. Specifically, VELARDE was found in possession of approximately 3,357 kilograms of marijuana. The **Target Devices** are currently in the possession of the Department of Homeland Security and are presently stored at 9495 Customhouse Plaza, San Diego, California 92154.

3. Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as more particularly described in Attachment B.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not contain all of the

information known to investigators about this investigation. It contains only those facts believed to be necessary to establish probable cause. In addition, information contained in this affidavit is based upon reviews of official reports and records, conversations with other investigators experienced in the area of drug investigations, and my personal observations and knowledge. When the contents of documents or statements of others are reported herein, they are reported in substance and in part unless otherwise indicated. Dates and times are approximate.

## TRAINING AND EXPERIENCE

5. I am a Special Agent with the United States Department of Homeland Security ("DHS"), United States Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I am cross-designated and have the authority to conduct Title 21 investigations and enforcement activities. I have been involved with investigations for Title 21 offenses and am familiar with the Interagency Cooperation Agreement between U.S. Drug Enforcement Administration and ICE. Furthermore, I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

6. I have held my current position with HSI since August of 2016. I was employed as a Customs and Border Protection ("CBP") Officer from March of 2012 to August of 2016 prior to entering on-duty as an HSI Special Agent. I obtained a Bachelor of Arts, with honors, in Political Science from the California State University, Dominguez Hills in Carson, California.

7. I am a graduate of the Federal Law Enforcement Training Center ("FLETC") Criminal Investigator Training Program ("CITP") and the Homeland Security Investigations Special Agent Training ("HSISAT") course. During these courses, I was trained in various types of criminal investigations, to include investigations involving the illegal trafficking of narcotics, currency, firearms and contraband.

8. My training and experience in narcotics enforcement has included narcotics interdiction, the identification of different types of narcotics, and the investigation of persons in possession of narcotics for purposes of sales and transportation. In addition, I speak regularly with narcotics investigators at the federal, state and local level regarding the manner in which sellers of narcotics store, transport and sell narcotics.

9. I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.

10. During my tenure, I have participated in numerous investigations involving narcotic and human trafficking and have performed various investigative tasks involving the following:

   a. Functioning as a case agent which entails the supervision and case development of specific aspects surrounding the trafficking of narcotics and humans;

   b. Functioning as a surveillance agent and thereby observing and recording movements and methods of those involved in the trafficking of narcotics and humans;

   c. Interviewing of material witnesses, principals, load drivers, north side coordinators and other persons involved in the trafficking of narcotics, humans and the distribution of monies and assets derived from such illegal activities; and

   d. Participating in investigations involving the purchase of controlled substances, the execution of search warrants, surveillance in connection with narcotic investigations, and the interviews of confidential sources;

   e. Supervising, as a case agent/co-case agent, specific investigations involving trafficking of humans, narcotics, weapons and the laundering of monetary instruments.

11.     As a law enforcement officer, I have participated in approximately 100 arrests for narcotics-related and money laundering-related offenses. I have participated in over 20 investigations that involved various investigative techniques, such as undercover operations, the use of confidential informants, the purchase of controlled substances, the execution of search warrants, surveillance in connection with narcotics investigations, or interviews of confidential sources. Through training and participation in these investigations, I have gained valuable insight into the typical makeup and operation of gangs and drug trafficking organizations and the various methods these organizations use to carry out their violent crime and narcotics trafficking activities.

12.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics and human trafficking investigations, I am also aware that:

   a. Drug traffickers will use digital devices like cellular telephones because they are mobile, and they have instant access to telephone calls, text, web, email, and voice messages;
   b. Drug traffickers will use digital devices like cellular telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;
   c. Drug traffickers and their accomplices will use digital devices like cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;
   d. Drug traffickers will use digital devices like cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;
   e. Drug traffickers will use digital devices like cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings;

f. The use of digital devices like cellular telephones by traffickers tends to generate evidence that is stored on the digital devices, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; and

g. Individuals involved in the illegal possession and acquisition of drug trafficking often utilize digital devices like cellular telephones with photograph and video capabilities to take and send photographs and videos of other members of criminal organizations, drugs, criminal proceeds, and assets purchased with criminal proceeds.

13. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

a. tending to indicate efforts to import marijuana or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of marijuana or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of marijuana or some other federally controlled substances from Mexico into the United States;

*Affidavit in Support of Search Warrants*        5

    d. tending to identify travel to or presence at locations involved in the importation of marijuana or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

14. Subscriber Identity Module ("SIM") Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

15. Furthermore, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via mobile telephone after his or her arrest to determine the whereabouts of drugs that are being transported.

## FACTS IN SUPPORT OF PROBABLE CAUSE

16. According to the report of CBP Officer T. Touch, at about 7:08 a.m. on January 15, 2020, Officer Touch was assigned to primary lane 7 at the Otay Mesa Commercial Facility. At that time, VELARDE drove a maroon tractor with California license plate

XP53935, hauling a white commercial trailer (the "vehicle") with California license plate 49Y7785, into the primary inspection. Officer Touch conducted computer queries of the vehicle and received a computer-generated alert for an agriculture inspection of the manifested fresh papaya. Officer Touch instructed VELARDE to proceed to agriculture inspection for further examination. Officer Touch contacted agriculture personnel and informed them of the referral.

17. According to the report of CBP Agriculture Specialist R. Diaz, Agriculture Specialist Diaz conducted an agriculture inspection of the papaya contained within the vehicle. During the inspection, Agriculture Specialist Diaz discovered several brown cardboard boxes without labels. Agriculture Specialist Diaz opened two of the brown cardboard boxes and discovered packages wrapped in cellophane. Agriculture Specialist notified CBP Branch Chief J. Sloan of the discovery.

18. According to the report of CBP Officer L. Yorba, at about 9:00 a.m. on January 15, her K-9 Unit alerted to a trained narcotic odor emanating from the papaya.

19. According to the report of CBP Officer M. Norman, Officer Norman was assigned to the Otay Mesa Commercial Facility when she was asked to inspect the cellophane wrapped packages discovered within the brown cardboard boxes. Officer Norman probed a random package and discovered a green leafy substance. Officer Norman field-tested the substance and received positive results for the characteristics of marijuana. In the interest of furthering the investigation, Officer Norman left the remaining merchandise intact and the merchandise was reloaded into the cargo area of the vehicle.

20. I was notified of the discovery of marijuana and responded to the Otay Mesa Commercial Facility. At approximately 11:30 a.m., VELARDE was allowed to depart the Otay Mesa Commercial Facility while driving the vehicle under the constant surveillance of HSI personnel. During the surveillance, investigators observed VELARDE meeting with a Hispanic male at the Pilot gas station in Otay Mesa. VELARDE departed the Pilot gas station at approximately 12:23 p.m., and was observed driving a circuitous route through San Diego, CA. At approximately 12:56 p.m., VELARDE parked the vehicle at a truck

parking lot in the Otay Mesa area of San Diego, CA. The surveillance operation terminated, and I placed VELARDE under arrest for violation of 21 U.S.C. §§ 952 and 960. I conducted a search of VELARDE and discovered **Target Device 1** was in his possession at the time of his arrest.

21. At about 1:29 p.m., Special Agent Ryan Bean read VELARDE his *Miranda* rights, which he waived. In summary, VELARDE made the following statement. VELARDE denied knowledge of the drugs contained within the vehicle and stated he only believed he was transporting papaya. The vehicle was loaded with papaya late at night in Tijuana, Baja California on January 14, 2020. VELARDE drove the vehicle to the United States border with Mexico at approximately 5:00 a.m. on January 15, 2020. VELARDE has driven produce loads for this client two times. VELARDE further stated the client of this papaya shipment was the Hispanic male VELARDE met at the Pilot gas station. VELARDE was instructed to meet with the client at the direction of his supervisor Emanuel (a.k.a. "Bachis"). Furthermore, VELARDE stated he did not speak with the client on the phone directly. VELARDE stated he decided to not deliver the shipment because he received a call from Emanuel regarding VELARDE's mother suffering from a medical emergency in Mexico. VELARDE stated he also received calls from his girlfriend via WhatsApp regarding VELARDE's mother's medical emergency. Consequently, VELARDE decided to park the truck at the parking lot in Otay Mesa and intended to enter Mexico on foot.

22. At approximately 1:40 p.m., VELARDE granted investigators consent to search his cellular phone (**Target Device 1**) and gave investigators the passcode to his phone. VELARDE stated his girlfriend called him on his work phone (**Target Device 2**). VELARDE and the vehicle were transported to the Otay Mesa Commercial Facility for further processing.

23. Special Agent L. Gee, Special Agent K. Foreman, and Special Agent K. Laughlin conducted a search of the vehicle at the Otay Mesa Commercial Facility. During the search, Special Agent Foreman discovered **Target Device 2** in the center console area

of the vehicle. **Target Device 2** was turned over to CBP.

24. According to the report of CBP Officer M. Street, Officer Street was assigned to the Otay Mesa Commercial Facility when he was assigned the inspection of the vehicle. Officer Street opened an unmarked brown cardboard box found inside the vehicle and discovered large bundled packages. Officer Street probed a random package and discovered a green leafy substance. Officer Street field-tested the green leafy substance and received positive results for the characteristics of marijuana. Officer Street continued to search the cardboard boxes contained within the vehicle and discovered a total of 315 packages of marijuana concealed within brown carboard boxes. The packages of marijuana had a combined weight of 3357 kilograms (7400.84 pounds). Officer Street seized the 315 packages of marijuana and the **Target Devices**.

25. On January 23, 2020, Special Agent K. Foreman conducted database queries of VELARDE and discovered Bill of Lading number SUYF-9QW12482871, filed on November 25, 2019. Bill of Lading number SUYF-9QW12482871 lists VELARDE as the driver for a shipment of fresh papaya for importer LE TROPICALES S DE RL DE CV. On January 23, 2020, I reviewed the manifest for VELARDE's January 15, 2020 shipment and discovered it listed VELARDE as the driver for a shipment of fresh papaya for importer LE TROPICALES S DE RL DE CV.

26. Given the facts surrounding the arrest of VELARDE, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in drug smuggling investigations, I submit that there is probable cause to believe that information relevant to the smuggling activity of VELARDE will be found in the **Target Devices**. I also know that narcotics trafficking activities entail intricate planning to successfully evade detection by law enforcement. This planning often includes coordination on crossing the border to develop a crossing history or pattern. In my professional experience, narcotics trafficking activities involve planning and coordination in the weeks and often months prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject

after the arrest to determine the whereabouts of their cargo.

27. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that information relevant to the drug smuggling and trafficking activities of VELARDE, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. For the reasons set forth above, I request permission to search the **Target Devices** for items listed in Attachment B for the time period from October 25, 2019, which is one month prior to the date VELARDE was the driver for the same papaya importer, up to and including January 16, 2020, the day following VELARDE's arrest.

## METHODOLOGY

28. It is not possible to determine, merely by knowing a cellular telephone's or tablet's make, model and serial number, the nature and types of services to which the devices are subscribed and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their devices—both phones and tablets—over the internet and remotely destroy all of the data contained on the devices. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones and tablets do not have hard drives or hard-drive equivalents and store information in volatile memory within the devices or in memory cards inserted into the devices. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models, and some tablets, using forensic hardware and software. Even if some of the stored

information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and any associated memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

30. Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

31. At the time of VELARDE's arrest, investigators conducted a manual search of **Target Device 1** with the consent of VELARDE. I have not relied on any information obtained from that search in this warrant application. No prior attempts to download **Target Device 2** were made. Going forward, the Government will rely only on reviews of the **Target Devices** authorized by this warrant (and any others the Government obtains).

## CONCLUSION

32. Based on all of the facts and circumstances described above, I believe probable cause exists to conclude that VELARDE used the **Target Devices** to facilitate violations of Title 21, United States Code, Sections 952, 960, and 963.

33. Because the **Target Devices** were promptly seized following the arrest of VELARDE at the Otay Mesa POE, there is probable cause to believe that evidence of the smuggling offense committed by him continues to exist on the **Target Devices**. As stated

*Affidavit in Support of Search Warrants*  11

above, I believe that the date range for this search is from October 25, 2019, up to and including January 16, 2020.

34. WHEREFORE, I request that the court issue a warrant authorizing HSI Special Agents and/or other federal and state law enforcement officers specially trained in digital evidence recovery, to search the **Target Devices**, as described in Attachments A-1 and A-2, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
KEITH A. BANKS
Homeland Security Investigations Special Agent
Department of Homeland Security

Subscribed and sworn to before me on this 24th day of January, 2020.

_____
THE HON. ANDREW G. SCHOPLER
United States Magistrate Judge

# Attachment A-1

## *Item to be Searched*

The item to be searched is as follows:

> Red Huawei Cellular Phone
> IMEI 861677042678956
> ("**Target Device 1**")

**Target Device 1** is currently in the possession of the Department of Homeland Security and is presently stored at 9495 Customhouse Plaza, San Diego, CA 92154.

*Affidavit in Support of Search Warrants*          1

## Attachment B

### *Items to be Seized*

Authorization to search the **Target Devices** includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones for evidence described below. The seizure and search of the cellular/mobile telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Devices** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, October 25, 2019, up to and including January 16, 2020:

a. tending to indicate efforts to import marijuana, or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of marijuana or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of marijuana or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of marijuana or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

   a. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.